# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BRIAN ADAMS o/b/o**
**WILLIAM ADAMS,**

                **Plaintiff,**

**-vs-**                                        **Case No.  6:04-cv-1077-Orl-KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

                **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the complaint filed by

Brian Adams on behalf of his father, William Adams,[1] seeking review of the final decision of the

Commissioner of the Social Security Administration (Commissioner) denying Adams's claim for

social security disability benefits.  Doc. No. 1.  The Commissioner answered the Complaint and

filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 9.

Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28

U.S.C. § 636(c).  Doc. Nos. 11, 12.

---

[1]  I will refer to William Adams as either "Adams" or Claimant, and Brian Adams as either
"Brian Adams" or Plaintiff.

## I.    PROCEDURAL  HISTORY.

In September 1999, Adams applied for a period of disability and disability insurance

benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42

U.S.C. § 401, *et seq*,  and for disability benefits under the Supplemental Security Income for the

Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*., (sometimes collectively

referred to herein as the Act).  R. 80–82 (OASDI application), 239–241 (SSI application).  The

applications allege that Adams became disabled on July 21, 1999.  *Id*.  Adams's applications were

denied initially and on reconsideration. R. 69–70, 72–75, 228–32.

Adams made a timely request for a hearing before an administrative law judge (ALJ).  R.

68.  An ALJ held a hearing on March 12, 2002.  Adams, represented by a person who was not an

attorney, testified at the hearing.  No other testimony was taken.  R. 37–60.

On May 29, 2002, after considering the testimony and the medical evidence presented, the

ALJ issued a decision in which she determined that Adams was insured under OASDI through the

date of the decision.  Nevertheless, the ALJ concluded that Adams was not disabled for purposes

of the Act.  R. 15-22.

Adams timely requested review of the ALJ's decision. R. 11.  On November 12, 2002, the

Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 7-9.  Adams

timely sought review of this decision by this Court.  *See Adams v. Comm'r of Soc. Sec.*, Case No.

6:03-cv-218-ORL-DAB.  The Commissioner moved for entry of judgment so that the case could

be remanded to SSA for further proceedings.  The motion was granted, the decision was reversed,

and the case was remanded for further proceedings.  R. 279-80.

On or about June 17, 2003, Adams passed away.  The cause of death is listed a probable cardiac dysrhythmia and hypertensive cardiomyopathy, accompanied by chronic obstructive pulmonary disease (COPD).[2]  R. 285, 307-08.  Brian Adams filed a Notice Regarding Substitution Upon Death of Claimant and requested to be made a substitute party.  R. 286.

The Appeals Council vacated the ALJ's decision pursuant to the order of this Court and remanded for further proceedings.  R. 282–83.  Thereafter, the same ALJ held a supplemental hearing at which Jane Beougher, a vocational expert (VE) testified.  While Brian Adams was not administered an oath, he answered certain questions posed by the ALJ.  R. 310–23.

On May 14, 2004, the ALJ issued a decision on Adams's applications.  R. 257-69.  The ALJ concluded that "[t]here is no indication in the record that there is any eligible person who can be a substituted party for the purposes of the deceased claimant's application for supplemental security income payments," and concluded that Adams's application for SSI benefits was moot. R. 258–59.

After considering the testimony and the medical records presented, the ALJ determined that Adams's date last insured under OASDI was December 31, 2002.  R. 258.  She found that Adams had not engaged in substantial gainful activity from his alleged onset date through his date last insured.  R. 260.

---

[2]  Chronic obstructive pulmonary disease is a "progressive disease of the airways that is characterized by a gradual loss of lung function. . . . It represents the fourth leading cause of death in the U.S."  National Heart, Lung, and Blood Institute, Chronic Obstructive Pulmonary Disease, http://www.nhlbi.nih.gov/health/public/lung/other/copd_fact.pdf (last modified March 2003).  It is most commonly caused by smoking, but is also caused by occupational dusts and chemicals. *Id.*

The ALJ found that Adams had the following medically determinable impairments: asthma, insulin dependent diabetes, hypertension (controlled by medication), sleep apnea, COPD with episodic shortness of breath, and obesity.  R. 264.  The ALJ concluded that these impairments were severe for purposes of the regulations, but that they did not meet or medically equal any of the impairments in the Listings.[3]  *Id.*

The ALJ concluded that the record did not support a finding that Adams had a heart condition for the period between his alleged onset date of July 21, 1999, and his date last insured, December 31, 2002, "even though he did have hypertension and even though that is listed as the cause of his death."  R. 265.

The ALJ further found that Adams's testimony regarding his limitations was not fully credible.  The ALJ stated:

> Considering the claimant's testimony in connection with the medical evidence, the undersigned finds that his statements of record are not fully credible and persuasive of an inability to perform work-related activities.  The claimant alleged asthma. The medical records from his treating physician indicate that he did improve with treatment; however, he continued smoking against his doctor's advice.  The claimant alleged diabetes and sleep apnea.  The record indicates that the claimant has been consistently noncompliant with his medication and his sleep disorder improved when he used the BIPAP machine.  The claimant alleged that his non-compliance was due to insufficient funds; however, insufficient funds do not account for his continued smoking of cigarettes and his failure to use the BIPAP machine . . . .

*Id.*

---

[3]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

The ALJ found that Adams had the residual functional capacity (RFC)[4] to perform a wide range of light work.[5]  Specifically, the ALJ found that Adams could lift or carry twenty pounds occasionally and ten pounds frequently, and could stand, walk, or sit for up to six hours in an eight-hour workday.  However, the ALJ found that Adams had environmental limitations such that he needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  The ALJ also found that Adams had postural limitations in that he could only occasionally climb, stoop, crouch, crawl, or kneel.  *Id.*

In reaching this conclusion, the ALJ afforded weight to the opinions of Dr. Tan, a reviewing physician, Dr. Haté, a consulting physician, and Dr. Lee, a treating physician.  R. 265-66 (citing R. 205-12).  The ALJ afforded little weight to the physical capacity evaluation done by Muhammad K. Shaukat, M.D., Adams's treating physician.  R. 266.  The ALJ concluded that Dr. Shaukat's physical capacity evaluation was contradicted by Dr. Shaukat's own clinical notes, was inadequate because it did not discuss Adams's documented noncompliance, and was inconsistent with the opinions of consultative physicians. *Id.*

Based on this RFC determination, the ALJ concluded that Adams could not perform any of his past relevant work.  *Id*.  Moreover, the ALJ found that Adams suffered from exertional and

---

[4]  "Your  residual functional capacity is the most you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  It is based on "any statements about what you can still do that have been provided by medical sources," along with "descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons." *Id.*

[5]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.

nonexertional impairments that prevented him from performing a full range of light work.  R. 267.

However, based on the VE's testimony that a person with Adams's limitations could perform work

as an airport cart driver, a dispatcher, and an alarm code monitor, all of which existed in

significant numbers in the national economy, and considering the Medical-Vocational Guidelines

(the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ concluded that Adams was not disabled

for purposes of the Act.  R. 269.

While there are no documents in the record indicating whether Brian Adams appealed the

ALJ's decision, the complaint alleges that the Appeals Council denied his claim for review, and

that the present action was "commenced within the appropriate time period . . . ."  Doc. No. 1 ¶¶ 2,

3.  The Commissioner's answer admits these allegations.  Doc. No. 9 ¶¶ 1, 3.

## II.    JURISDICTION.

The applicable SSI regulations provide that "[n]o benefits may be paid to the estate of any

underpaid recipient, the estate of the surviving spouse, the estate of a parent, or to any survivor

other than those listed in paragraph (b)(1) through (3) of this section."  20 C.F.R. § 416.542(b)(4).

The survivors listed in paragraphs (b)(1) through (3) of this regulation are the applicant's surviving

spouse or the parents of a disabled child.  There is no provision for payment of SSI benefits to a

surviving child.  *See Torres v. Barnhart*, No. 01 CIV 8312 KMW FM, 2002 WL 31932046

(S.D.N.Y. Dec. 31, 2002).  Accordingly, Brian Adams does not have standing to appeal the

Commissioner's decision regarding SSI benefits allegedly due to his father.[6]

---

[6] I previously entered an Order of Dismissal based on the fact that Brian Adams's original memorandum of law was addressed only to benefits allegedly due under SSI.  Doc. No. 17.  Brian Adams requested that I vacate that Order because he intended to appeal the denial of benefits under OASDI.  Doc. No. 18.  This motion was granted and the case reopened.  Doc. No. 19.

With respect to the application for benefits under OASDI, Brian Adams does have standing to appeal the Commissioner's decision. 42 U.S.C. §§ 404(d)(5), 416(e). Therefore, this Order is limited to the claim for benefits allegedly due under OASDI.

The Commissioner has issued a final decision on Adams's claim for benefits. *See* Doc. No. 9 ¶¶ 1, 3. Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### III.   STATEMENT OF FACTS.

*A.    Evidence from Adams.*

Adams was born February 12, 1959. R. 42. He was 5'11" and he weighed 263 pounds at the time of the March 2002 hearing. R. 42. A few years before his hearing, Adams had weighed as much as 298 pounds. R. 42.

Adams completed the tenth grade. R. 42. He had previously worked as a heavy machinery operator in a coal mine, a road builder, a carpenter, and a shuttle driver. R. 43, 45, 89-96, 99, 109.

Adams had a driver's license, but had not driven for approximately two years because he experienced blurred vision due to diabetes and had problems staying awake due to sleep apnea.[7] R. 43, 45. Adams estimated that he would doze off for approximately ten to fifteen minutes every two hours, and stated that these episodes were out of his control. R. 45. These sleeping problems precluded him from operating heavy equipment. R. 43. Adams used a C-PAP machine, which helped him get an hour or so of solid sleep, but which he could not use for more than about three hours at a time.[8] R. 49.

_____

[7]   Sleep apnea is a condition in which a person stops breathing during his or her sleep. STEDMAN'S MEDICAL DICTIONARY 114 (26th ed. 1995) (hereinafter STEDMAN'S).

[8]   A "constant positive airway pressure" (C-PAP) machine delivers air pressure at a constant rate through a mask affixed to the nose and/or mouth and is used in the treatment of sleep

Adams took medication for diabetes in the morning, and, if his blood sugar remained high, he would administer a shot of insulin to himself.  R. 46.

Adams also had shortness of breath due to asthma, which caused him to have coughing spells.  R. 46, 48.  Adams smoked cigarettes, but quit about three and one-half months before the March 2002 hearing with the help of Zyban.[9]  R. 46.  One of his doctors wanted to perform surgery to open up Adams's sinuses, but, due to a lack of insurance, Adams could not have the surgery.  R. 49.

Sometimes his hypertension made him feel light-headed.  R. 47.  He could not bend over because hypertension would cause him to become dizzy.  R. 57.  While his hypertension was generally controlled, it was aggravated by mood swings, for which he had been prescribed Zoloft.[10]  R. 47.

Adams represented in his request for reconsideration that he had "[d]eveloped congestive heart failure."  R. 85; *see also* R. 98, 108.  However, this issue was not discussed during the hearing.

---

apnea.  It is similar to a "bilevel positive airway pressure" (BI-PAP) machine, which delivers higher pressure when the patient inhales, and lower pressure when the patient exhales, and is also used in the treatment of sleep apnea.  At times, Adams used both types of machines.  *See* Mayo Clinic.com, *Sleep Apnea—Treatment*, http://www.mayoclinic.com/health/sleep-apnea/ DS00148/DSECTION=8 (last visited Sept. 7, 2006).

[9]  Zyban is the brand-name for bupropion, an antidepressant also used to in smoking cessation programs.  *See* MEDLINE PLUS DRUG INFORMATION, *Bupropion,* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html (last visited Sept. 7, 2006).

[10]  Zoloft is the brand-name for sertraline, an antidepressant.  *See* MEDLINE PLUS DRUG INFORMATION, *Sertraline,*  http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a697048.html (last visited Sept. 7, 2006).

Adams did not have insurance, and he could not afford to have regular examinations by a physician. R. 47-48, 54, 96. Adams did not always comply with the treatment his physicians prescribed because he could not afford medication, and, therefore, he was only able to take it when his physicians had free samples he could use. R. 47–48, 53–55. The medications Adams took had the side effect of making him drowsy. R. 49.

On a typical day, Adams would get up between 6:00 and 7:00 a.m., read a newspaper, or watch television. He would then go outside to the yard for a while, and lie down on the couch around 11:00 a.m. He would get up again at around noon to eat lunch. Because he was often tired, he would do very little for the rest of the afternoon. He would sleep from approximately 8:30 or 9:00 p.m. until 11:00 p.m. with the aid of the C-PAP machine, wake up, go back to bed for a few hours, and then wake up again. He opined that his irregular sleep pattern was caused by both depression and his medications. R. 50.

Adams's girlfriend did his laundry and grocery shopping. R. 51. Adams could accompany her to a convenience store, but was unable to participate in longer shopping trips. *Id.* He could not take a shower without assistance. *Id.* Adams required his girlfriend's help in getting dressed. *Id.* Because he became dizzy with bending, he avoided wearing tying shoes. R. 51-52, 57.

Adams could stand for approximately fifteen minutes before needing to sit due weakness in his legs. R. 52. When sitting, Adams would often become restless and would tap his legs. R. 55. Adams was afraid to lift even ten pounds because he feared he would fall. R. 52. He could walk a distance of approximately one hundred feet before becoming so tired and short of breath that he would have to stop. *Id.* Adams experienced numbness in his arms, which would often feel as though they were falling asleep. R. 56.

Adams testified further that he had difficulty concentrating, but could concentrate better when doing things he enjoyed, such as reading sports articles.  R. 58.

Brian Adams indicated that Adams had been hospitalized at the time of his death.  R. 322.  His representative indicated that Adams had been hospitalized for approximately thirty days prior to his death.  R. 322.[11]

B.    *Medical Records.*

In August 1999, an x-ray of Adams's chest revealed a small area of plate-like atelectasis at the right lateral lung base[12] and calcified granuloma at the apex of his right lung.[13]  R. 121.

Records indicate that Adams was admitted to the emergency room of Methodist Hospital in Morganfield, Kentucky, on September 16, 1999.  R. 122.  Notations on the medical records indicate that Adams had been discovered unconscious or sleeping at home, and that an ambulance was called.  *Id.*  His blood sugar was dangerously high, and a toxicology report indicated a possible cocaine overdose.  *Id.*  The diagnosis was respiratory depression due to drug overdose, chronic asthma and apnea and uncontrolled diabetes (noncompliant).  *Id.*  A BI-PAP machine was used.  R. 131.  Once he became alert, Adams refused further treatment by the hospital.  R. 122.

On September 17, 1999, Ada Willett, a certified physician's assistant who worked with

---

[11]  The ALJ attempted to subpoena these records but was unable to obtain a proper certificate of assurance from the nonattorney representative.  Because "the period of the alleged hospitalizations occurred over four months after the date last insured," the ALJ concluded that the medical records were not reasonably necessary for the full presentation of the case.  R. 264.

[12]  Atelectasis refers to an "absence of gas from a part or the whole of the lungs, due to failure of expansion or resorption of gas from the alveoli."  STEDMAN'S at 161-62.

[13]  Granuloma is an "indefinite term applied to nodular inflammatory lesions, usually small or granular, firm, persistent, and containing compactly group mononuclear phagocytes."  STEDMAN'S at 743.  Calcified means to be composed of calcium salts.  *Id.* at 259.

William H. Clapp, M.D., examined Adams.  R. 132–34.  She observed that Adams had been diagnosed with diabetes approximately four weeks before his September 16 hospitalization, when he was hospitalized for pneumonia.  R. 134.  A chest x-ray indicated "[p]ossible lower lobe infiltrate[14] and/or chronic changes," and a borderline heart size with a lightly unfolded aorta.  R. 133.  Willett noted further that Adams reported drinking a fifth of vodka every two days, smoking a half-pack of cigarettes each day, and using illicit drugs including cocaine and intravenous drugs.  R. 134.

Willett's assessment was as follows: diabetes mellitus (uncontrolled due to compliance), emphysema from chronic tobacco use, hypertension (uncontrolled but fairly stable), drug and alcohol abuse, pneumonia, otitis media,[15] and stool positive for blood.  R. 135.  Willett gave Adams samples of Zithromax Z[16] and Nasonex,[17] and prescriptions for Phenergan cough syrup,[18] and Humulin.[19]  R. 136.

---

[14]  Infiltrate refers to "[t]he act of permeating or penetrating into a substance, cell, or tissue; said of gases, fluids, or other matter held in solution."  STEDMAN'S at 869.

[15]  Otitis media is an inflammation of the middle ear.  STEDMAN's at 1272.

[16]  Zithromax is a macrolide antibiotic.  Drugs.com *at* http://www.drugs.com/zithromax.html (last visited Sept. 7, 2006).

[17]  Nasonex is a corticosteroid drug with anti-inflammatory properties that is usually administered in the form of a nasal spray.  Drugs.com *at* http://www.drugs.com/PDR/Nasonex_Nasal_Spray__50_mcg.html (last visited Sept. 7, 2006).

[18]  Phenergan is an antihistamine usually administered to treat the symptoms of allergies.  Drugs.com *at* http://www.drugs.com/phenergan.html (last visited Sept. 7, 2006).

[19]  Humulin is a product that allows people with diabetes to administer insulin to themselves.  Drugs.com *at* http://www.drugs.com/PDR/Humulin_N_Pen.html (last visited Sept. 7, 2006).

On September 20, 1999, Willett conducted a follow-up examination of Adams.  She assessed him with diabetes mellitus, insulin dependent with variable control.  Her orders were for Adams to remain on his medications and to monitor his blood sugar.  R. 132.

In early 2000, Adams began being seen by Muhammad K. Shaukat, M.D.  *See* R. 154.  On February 3, 2000, Dr. Shaukat ordered a magnetic resonance brain study.  R. 154.  The impression by David J. Rippe, M.D., the reviewing physician, was no intracranial abnormality, and inflammation of the sinuses.  R. 154.  A February 4, 2000, CT chest scan revealed calcified granuloma in the right lung apex.  R. 153.

On March 7, 2000, Adams was admitted to the Florida Hospital with shortness of breath and syncopal episodes.[20]  R. 155-57.  Adams appeared lethargic and had some ankle edema.  R. 155.  His wife reported that Adams stopped breathing at night and turned blue.  *Id.*  Adams was put on a BI-PAP machine, which improved his sleep problems.  R. 156.  No further syncopal episodes were observed.  *Id.*  Dr. Shaukat ordered several tests, and renewed Adams's prescriptions for Atrovent,[21] a Proventil nebulizer,[22] and a Flovent inhaler.[23]  R. 161–62.  His

---

[20]  Loss of consciousness and postural tone caused by diminished cerebral blood flow. STEDMAN'S at 1720.

[21]  Atrovent is an inhalant that widens the airways into the lungs and is used to treat asthma. Drugs.com *at* http://www.drugs.com/atrovent.html (last visited Sept. 7, 2006).

[22]  Proventil is the brand-name of albuterol, which relaxes muscles in the airways to improve breathing.  Drugs.com *at* http://www.drugs.com/Proventil_HFA (last visited Sept. 7, 2006).

[23]  Flovent is a steroid that prevents the release of chemicals in the body that cause inflammation and is often used to treat asthma.  Drugs.com *at* http://www.drugs.com/Flovent (last visited Sept. 7, 2006).

discharge diagnosis was sleep apnea, cor pulmonale,[24] obesity hypoventiation syndrome,[25] COPD, diabetes, and hypertension.  R. 157.

A CT scan of Adams's brain taken March 27, 2000, revealed a mucus retention cyst in the sinuses and blockage in the right middle ear cavity.  R. 151.  An x-ray of Adams's chest taken March 29, 2000, showed a decrease in the size of a lung edema.[26]  R. 150. The x-rays revealed that Adams's heart size was at the upper limits of normal.  R. 152; *see also* R. 150.

On April 4, 2000, Morris T. Bird, M.D., performed a "split-night" study of Adams at Dr. Shaukat's request.  R. 145.  The study revealed serial obstructive sleep apnea with major sleep fragmentation accompanied by major oxygen desaturation.  R. 145.  An electrocardiogram revealed regular sinus rhythm with cardiac accelerations and decelerations.  However, Dr. Bird observed that Adams's sleep improved with positive pressure support (use of a C-PAP or BI-PAP machine).  R. 145.

On April 28, 2000, Dr. Shaukat completed a physical capacities evaluation regarding Adams.  R. 141-44.  Dr. Shaukat opined that Adams would be able to sit, stand, or walk for less than one hour in an eight-hour workday because of asthma, sleep apnea, and congestive heart

---

[24]  "Cor pulmonale is failure of the right side of the heart caused by prolonged high blood pressure in the pulmonary artery and right ventricle of the heart. . . . Almost any chronic lung disease or condition causing prolonged low blood oxygen can lead to cor pulmonale."  MEDLINE PLUS, *Cor Pulmonale*, http://www.nlm.nih.gov/medlineplus/ency/article/000129.htm (last visited Sept. 7, 2006).

[25]  "Obesity hypoventilation syndrome occurs when a very obese person does not breathe enough oxygen while sleeping."  MEDLINE PLUS, *Obesity hypoventilation syndrome (OHS)*, http://www.nlm.nih.gov/medlineplus/ency/article/000085.htm (last visited Sept. 7, 2006).

[26]  Edema refers to the "accumulation of an excessive amount of water fluid in cells, tissues, or serous cavities."  STEDMAN'S at 544.

failure (CHF).  R. 141.  He indicated that Adams would need to have both feet elevated at all times because of edema.  *Id.*  He stated that Adams could perform no bending, stooping, squatting, kneeling, or climbing, and could not use his feet for repetitive movements such as pushing or pulling leg controls.  R. 142.  In addition, Dr. Shaukat opined that Adams could never lift up to five pounds during an eight-hour workday, nor could Adams perform any pushing and pulling arm controls, simple grasping, or fine manipulation.  *Id.*  Adams would be totally restricted from exposure to extreme cold or heat, high humidity, chemicals such as solvents or cleaners, fumes, odors, dust, moving machinery, and heights.  R. 143.  Dr. Shaukat also opined that it would be necessary for Adams to lie down or sit on a recliner for a substantial period of time during the day, and that Adams's impairments were permanent.  R. 143-44.  Dr. Shaukat opined that Adams was "totally disabled."  R. 144.  Dr. Shaukat reiterated his conclusion that Adams was totally incapacitated on July 11, 2000.  R. 139.

On May 3, 2000, Adams was seen by Dr. Shaukat.  With use of the C-PAP machine, Adams's "[h]ypersomnolence symptoms and syncopal episodes have resolved."  Adams's diabetes was well controlled with diet and exercise, and his asthma and hypertension were stable.  R. 140.

A pulmonary function report dated August 8, 2000, disclosed that Adams had moderate obstructive disease.  R. 168–73.

On September 13, 2000, Adams was seen by Edwin N. Lee, M.D., an endocrinologist, for a diabetes consultation.  Dr. Lee observed that Adams was insulin resistant and needed follow up treatment.  Upon examination, Dr. Lee noted that Adams's lungs were clear and his heart rate and rhythm were regular without murmurs, gallops or rubs.  Dr. Lee also observed that Adams was obese.  Dr. Lee noted that Adams also had knee problems.  Dr. Lee prescribed continued use of

insulin and Xenical[27] for weight loss.  R. 175.

     In September 2000, Dr. Shaukat again observed that Adams had severe asthma with continuing use of cigarettes, severe sleep apnea, uncontrolled diabetes, and hypertension.  Dr. Shaukat observed that Adams was using the BI-PAP machine at night, but only for a few hours.  In On November 8, 2000, Dr. Shaukat observed that Adams had recently been hospitalized.  Adams was complaining of shortness of breath (SOB) with coughing. Upon examination, Dr. Shaukat observed that Adams's lungs were hyperinflated with scattered wheezing.  He was not taking Glucophage[28] or complying with the prescribed diet, and his blood sugar was high.  Dr. Shaukat gave Adams samples of medication, stressed the need to comply with diet and medications, and directed Adams to refrain from cigarette use. R. 138.

     On October 19, 2000, Adams was admitted to the emergency room complaining of trouble breathing and tightness in his chest. R. 199-200.  The impressions of John H. Trimble, M.D., the admitting physician, were acute dyspnea,[29] asthma, and hypoxemia.[30]  R. 200.  Dr. Trimble observed no edema.  *Id.*  Adams was prescribed Albuterol and Atrovert nebulizers. R. 198.  Adams was admitted to the hospital on October 20.  *See* R. 176.  CT scans taken October 20 and 21, 2001,

---

[27]  Xenical is the brand name for orlistat, a lipase inhibitor that "blocks some of the fat you eat from being absorbed and digested."  Medline Plus Drug Information, *Orlistat*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601244.html (last visited Sept. 7, 2006).

[28]  Glucophage is the brand-name for metformin, a drug prescribed to regulate blood sugar. MEDLINE PLUS, *Metformin (Systemic)*,http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202756.html (last visited Sept. 7, 2006).

[29]  Dyspnea refers to shortness of breath.  STEDMAN'S at 535.

[30]  "Subnormal oxygenation of arterial blood . . . ."  STEDMAN'S at 841.

revealed sinusitis.  R. 182–83, 192–93. A chest x-ray revealed a normal size heart.  R. 184.

Dr. Shaukat assessed Adams with COPD, asthma, sleep apnea, obesity, diabetes, hypertension, and a history of congestive heart failure.  R. 178; *see also* R. 180 (same assessment on October 19).   Electrocardiograms revealed sinus tachycardia[31] and left atrial enlargement.  R. 177.  Dr. Shaukat administered Solu-Medrol,[32] Levaquin,[33] Proventil, an Atrovent nebulizer, Pepcid,[34] and Heparin[35] to Adams.  He also continued Adams's prescriptions for Norvasc,[36] Glyburide,[37] Lasix,[38] Zoloft, Flonase, and a nicotine patch.  R. 177.  Dr. Shaukat also put Adams on a diet approved by the American Diabetic Association and advised Adams to quit smoking.  R. 177.

---

[31] Tachycardia refers to excessively rapid beating of the heart. STEDMAN'S at 1758.

[32] Solu-Medrol is a corticosteroid, which reduces inflammation and is used to treat asthma. Drugs.com *at* http://www.drugs.com/cons/Solu_Medrol.html (last visited Sept. 7, 2006).

[33] Levaquin an antibiotic. Drugs.com *at* http://www.drugs.com/levaquin.html (last visited Sept. 7, 2006).

[34] Pepcid is a medication that inhibits the secretion of acids in the gastric system and is used to treat gastrointestinal inflammation. Drugs.com *at* http://www.drugs.com/PDR/Pepcid_Tablets.html (last visited Sept. 7, 2006).

[35] Heparin is an anticoagulant. Drugs.com *at* http://www.drugs.com/MTM/heparin.html (last visited Sept. 7, 2006).

[36] Norvasc is a calcium channel blocker, which widens blood vessels and relieves hypertension. Drugs.com *at* http://www.drugs.com/norvasc.html (last visited Sept. 7, 2006).

[37] Glyburide is in a class of drugs called sulfonylureas and is administered to control blood sugar levels in patients with diabetes. Drugs.com *at* http://www.drugs.com/glyburide.html (last visited Sept. 7, 2006).

[38] Lasix is a diuretic, or a water pill, that reduces the amount of fluid in the body by increasing the amount of salt and water lost in urine. Drugs.com *at* http://www.drugs.com/lasix.html (last visited Sept. 7, 2006).

On January 15, 2001, Dr. Lee wrote a letter to the Florida Office of Disability Determinations regarding Adams.   Dr. Lee opined that Adams's diabetes did not render him disabled.  Dr. Lee also indicated that he could not make a determination regarding whether Adams was disabled based on his weight or other orthopedic disorders and suggested that another physician may be able to do so.  R. 174.

On January 22, 2001, Nitin Haté, M.D., examined Adams at the request of the Florida Office of Disability Determinations. R. 201–03.  Adams complained of high blood sugar, shortness of breath after walking about fifty to one hundred feet, and insomnia which was alleviated somewhat by use of a C-PAP machine.  R. 201.  Dr. Haté observed that Adams was constantly coughing.  *Id.*  Upon examination, Dr. Haté observed that Adams's muscle strength in all major muscle groups was normal and that Adams had a full range of motion in all joints.  R. 202.  His sensory ability was intact.  *Id.*  Chest x-rays dated March 29, 2000, reflected decreased edema.  *Id.*  The August 2000 pulmonary function test reflected an 18% improvement with use of a bronchodilator.  R. 203.  Dr. Haté's final  impression was as follows: "The physical examination is essentially within normal limits.  There are no recommendations for any restrictions based on the physical examination.  However, based on pulmonary function tests, he may have some difficulty in strenuous physical activities generally."  R. 203.

Dr. Shaukat examined Adams in February 2001.  Adams's lungs were hyperinflated with intermittent wheezing.  Dr. Shaukat stressed the need for Adams to use his medication.  R. 246.

In July 2001, Adams presented to Dr. Shaukat "after a prolonged absence."  Dr. Shaukat observed that Adams was noncompliant with medication and use of the C-PAP machine.  His assessment was asthma exacerbation, sinusitis, sleep apnea, diabetes, and hypertension.  R. 245.

From August 9 to August 13, 2001, Adams was admitted to Florida Hospital in Orlando after visiting the emergency room complaining of shortness of breath.  R. 213–25.  His admitting report observed a history of congestive heart failure.  R. 221.  Victor A. Politano, D.O., observed severe asthma with COPD, sleep apnea, diabetes mellitus, morbid obesity, and poor compliance with doctors' instructions.  R. 213.  Dr. Politano noted that Adams "seemed to do well very shortly after treatment by Dr. Shaukat," and observed that Adams was anxious to go home.  *Id.*  In addition, Adams continued to smoke despite his physicians' instructions to quit.  *Id.*  Dr. Politano's discharge diagnosis was as follows: respiratory failure; COPD; asthma; diabetes mellitus type 2; sleep apnea; noncompliance; morbid obesity.  R. 214.

In October 2001, Adams was seen by Dr. Shaukat, who observed continued noncompliance.  Nevertheless, Adams was doing "relatively well [without] use of inhalers" and had only scattered wheezing.  Dr. Shaukat also observed trace ankle edema.  R. 244.

In December 2001, Dr. Shaukat observed noncompliance with medication, exacerbated sinusitis, and provided samples of medication.  He observed no wheezing.  R. 243.

In March 2002, Adams was seen by Dr. Shaukat for nasal congestion, shortness of breath, and coughing.  He was observed to have serious congestion and some wheezing.  However, his heart rate and rhythm were normal.  The assessment was sinusitis, allergic rhinitis,[39] asthma, and depression.  Adams was advised to continue his medications, including antibiotics, and was given Zoloft to treat his depression.  The notes indicate that Adams "has been noncompliant due to financial difficulties with purchasing the prescribed medications in the past.  We will provide

---

[39]  Inflammation of the nasal mucus membranes.  STEDMAN'S at 1544.

samples when available." R. 247.

Between May 9 and May 23, 2002, Adams was again admitted to the hospital for shortness of breath and chest pain. R. 249-51. While hospitalized, Adams was put on a BI-PAP machine. R. 251. On discharge, Dr. Shaukat diagnosed Adams with the following: respiratory failure; pneumonia; COPD, sinusitis; diabetes; and hypertension. R. 249. Dr. Shaukat noted that "[c]ontinuing cigarette abuse is reported." R. 253.

On or about June 17, 2003, Adams passed away. R. 285, 307–08. One of the death certificates in the record lists the cause of death as follows: "Probable cardiac dysrhythmia[40] [and] [h]ypertensive cardiomyopathy.[41]" R. 307. COPD was also listed as a significant condition. *Id.*

C.      *Reviewing Professional.*

On February 7, 2001, Uldarico B. Tan, M.D., completed a physical RFC assessment of Adams. R. 205-12. Dr. Tan opined that Adams would be subject to the following exertional limitations: (1) occasionally lifting and carrying no more than twenty pounds; (2) frequently lifting and carrying no more than ten pounds; (3) standing or walking for six hours in an eight-hour workday; and (4) sitting for six hours in an eight-hour workday. R. 206. Dr. Tan opined that Adams would have to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation due to COPD. R. 209. Dr. Tan stated that he considered Adams's asthma and COPD in making his findings regarding Adams's ability to lift and carry. R. 210.

---

[40] Defective rhythm. STEDMAN'S at 535.

[41] A disease of the heart muscle, often of unknown etiology. STEDMAN'S at 282, 1167.

D.      *Vocational Expert Testimony.*[42]

The ALJ asked the VE to assume a claimant between the ages of forty and forty-four years of age, who has a tenth grade education, and with Adams's past relevant work.  R. 316.  The claimant could lift and carry twenty pounds occasionally and ten pounds frequently, could sit, stand, or walk for six hours out of an eight-hour day, but was to avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation.  R. 316.  The claimant could also only occasionally climb, stoop, crouch, crawl, and kneel.  R. 317.  The VE opined that such an individual would not be able to do any of Adams's past relevant work.  R. 316-17.

However, the VE testified that a claimant with those limitations would be able to do other work, including cart driver–airport, which is semi-skilled light work, DOT 359.677-022, dispatcher, which is sedentary work, DOT 249.167-014, and alarm code monitor, which is skilled sedentary work, DOT 379.362-014.  R. 316.  The VE also identified pari-mutuel ticket checker, which is unskilled sedentary work, DOT 219.587-010, and addresser, which is also unskilled sedentary work, DOT 209.576.010.  R. 320.

The VE opined that limiting the hypothetical such that the claimant could perform only simple routine tasks eliminated alarm code monitor.  R. 317.  The VE further opined that if a claimant were likely to miss more than two or three days of work every other month because of a need for medical treatment or hospitalization, that he likely could not be employed.  R. 318.

---

[42]  The record is missing page 319, which apparently includes a portion of the VE's testimony.  Neither party argues that this omission is material.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to

a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

## V.    ANALYSIS.

Plaintiff asserts five grounds supporting reversal. First, that the ALJ erred in failing to find Adams's heart condition a severe impairment. Second, that the ALJ failed to develop the record. Third, that the ALJ's decision as to Adams's ability to perform alternative work was not based on substantial evidence. Fourth, that the ALJ failed properly to consider Adams's subjective testimony. And fifth, that the ALJ failed properly to consider the impact of Adams's obesity on his ability to work. These are the only issues I will address.[43]

### A.    Whether Adams's Heart Condition Was a Severe Impairment.

Plaintiff contends that the ALJ erred by failing to find that Adams had a severe impairment arising from his heart condition. He contends that if the ALJ had insufficient evidence to determine that Adams had a severe impairment arising from his heart condition, that she should have ordered a cardiac consultation.

A severe impairment under the regulations is any impairment or combination of impairments that "significantly limits [a claimant's] physical or mental ability to do basic work

---

[43] The parties were advised that issues not specifically raised would be waived. Doc. No. 10 at 2.

activities." 20 C.F.R. § 404.1520(c).  "An impairment or combination of impairments is not

severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work

activities." 20 C.F.R. § 404.1521(a).  The Eleventh Circuit has held that "an impairment can be

considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the

individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th

Cir. 1984).

Severity is a threshold determination. *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987).  Once

this threshold showing has been made and an ALJ finds that a claimant has any severe impairment

or combination of impairments, she is required to consider the effect of all of a claimant's

limitations in the subsequent steps of the sequential analysis.  20 C.F.R. § 404.1523.

The record indicates that in March 2000, Adams was diagnosed with cor pulmonale, which

is a partial failure of the heart.  Adams was also diagnosed with sinus tachycardia.  Dr. Shaukat

observed that Adams had a history of congestive heart failure.  Further, the death certificate

indicates that cardiac problems were a likely cause of Adams's death.  These records reflect,

contrary to the Commissioner's argument, that Adams's heart condition existed for a continuous

period of twelve months or more.  Furthermore, the earliest of these diagnoses were made before

Adams's date last insured.  Accordingly, the ALJ's conclusion that "[t]he record does not support

[Adams's] allegation that he had a heart condition for the period of time at issue" between his

alleged onset date and his date last insured, is not supported by substantial evidence.  R. 264–65.

However, Plaintiff does not point to any evidence in the record that supports a finding that

Adams's heart condition resulted in impairments beyond those identified and considered by the

ALJ. As such, even assuming that the ALJ should have designated Adams's heart condition as a severe impairment, any error would be harmless. *Cf. Dowdy v. Barnhart*, Civil Action No. 1:04cv1056, 2005 WL 3841868, at * 3-4 (M.D. Ala. Jan. 4, 2005)(finding that the ALJ did not err because evidence did not show that severe shoulder impairment resulted in functional limitations other than those considered by the ALJ).

       B.       *Whether the ALJ Properly Developed the Record.*

Plaintiff contends that the ALJ erred by failing to order a consultative examination on Adams's heart condition or the extent to which his obesity would have affected his ability to work.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). "If [a claimant's] medical sources cannot or will not give [SSA] sufficient medical evidence about [a claimant's] impairment for [SSA] to determine whether [a claimant] is disabled," SSA may order a consultative examination. 20 C.F.R. § 404.1517; *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (holding that it may be reversible error not to order a consultative examination when one is necessary to make an informed decision).

Remand for further development of the record may be appropriate where there are "evidentiary gaps which result in unfairness or clear prejudice." *Brown v. Shalala*, 44 F.3d 931, 935-36 (11th Cir. 1995) (internal quotations and citations omitted). "The likelihood of unfair prejudice to a claimant may arise . . . [when] the evidentiary gap involves recent medical treatment, which the claimant contends supports her allegations of disability, or the receipt of vocational services." *Id*. at 936 n.9.

The record in this case contains a number of records from Adams's hospital admissions and treatment records from Dr. Shaukat and Adams's other treating physicians. These records contain a discussion of Adams's heart condition. Plaintiff has not identified any evidentiary gaps in the record regarding Adams's heart condition—other than opining that more evidence may have provided additional information. This does not rise to the level of prejudice.

As to whether the ALJ should have ordered a consultative examination regarding Adams's obesity or orthopedic problems, Plaintiff misconstrues Dr. Lee's report. Dr. Lee stated that he was unable to determine whether Adams may have been disabled due to his weight or other orthopedic problems,[44] and suggested that another physician could make this determination. R. 174. Properly read, this is simply an acknowledgment that Dr. Lee, an endocrinologist, was not qualified to make a determination about disability based on problems outside his specialty.

The record indicates that the ALJ considered Adams's weight in concluding that Adams had postural limitations such that he could only occasionally climb, stoop, crouch, crawl, or kneel. Accordingly, Plaintiff has shown no prejudice as a result of the ALJ's failure to order a consultative examination on this issue.

---

[44] Adams did not complain of knee or other orthopedic problems during the March 2002 hearing.

C.      *Consideration of Adams's Obesity.*

Plaintiff next contends that the ALJ failed properly to consider the effect Adams's obesity

would have on his ability to do other work.  Specifically, Plaintiff contends that the ALJ erred by

not discussing the requirements of Social Security Ruling (SSR) 02-01p (Sept. 12, 2002), 2000

WL 628049.  This SSR provides that the Commissioner will consider, among other things, the

effect of obesity in combination with other impairments, and that obesity may be a factor in

finding that another severe impairment meets or medically equals a listing.  It states that obesity

should be considered in assessing ability to perform routine movements, especially in cases

involving sleep apnea.  *Id.*

Plaintiff's contention regarding the ALJ's consideration of SSR 02-01p is unavailing.

While the ALJ did not cite this SSR in her decision, she found that Adams had obesity that rose to

the level of a severe impairment. The ALJ found that Adams had the physical capacity to perform

a wide range of light work, but that additional exertional and nonexertional impairments prevented

him from performing the full range of light work.  Although the ALJ did not specifically address

how obesity factored into the RFC analysis, it is clear from the opinion as a whole that the ALJ

properly considered Adams's weight in reaching her decision.  *See Hennes v. Comm'r of Soc. Sec.*,

130 Fed. Appx. 343, 347 n.11 (11th Cir. 2005)(citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th

Cir. 2005)).

D.      *Whether the ALJ Properly Considered Adams's Subjective Testimony.*

Plaintiff contends that the ALJ failed properly to consider Adams's subjective complaints.

In the Eleventh Circuit, consideration of pain and other subjective complaints must be done

consistent with the "pain standard."  "The pain standard requires (1) evidence of an underlying

medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* at 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

Here, the ALJ concluded that Adams's testimony was not fully credible and persuasive of an inability to perform any work.  As grounds for this conclusion, the ALJ considered the fact that Adams's asthma and sleep apnea improved with treatment, he was noncompliant with his medication for diabetes and other conditions, and that he continued smoking against his doctor's advice.  Asthma, sleep apnea and diabetes are objectively determinable underlying medication condition which could lead to pain or other limitations on ability to work.  There is evidence in the record that when Adams was treated with prescribed medication and use of a BI-PAP or C-PAP machine, his condition improved. *See, e.g.,* R. 131, 140, 145, 156.

The ALJ acknowledged the evidence that noncompliance with medication was due to lack of funds.  However, she also noted, and the evidence supports, that Adams failure to stop smoking cigarettes at an earlier date and his failure to use the BI-PAP machine were not the result of lack of financial resources. Moreover, while Adams testified in March 2002 that he had quit smoking, Dr. Shaukat subsequently noted that continued cigarette abuse was reported.  R. 253.  This evidence

supports the ALJ's conclusion that Adams's testimony was not entirely reliable.

The ALJ articulated specific and adequate reasons to support her credibility finding, which reasons are supported by substantial evidence in the record. Accordingly, this assignment of error is unavailing.

> E.      *Whether the ALJ Properly Determined that Adams Could Do Other Work.*

Plaintiff contends that the ALJ erred by failing to include all of the limitations identified by Dr. Shaukat's physical capacities evaluation, which the ALJ concluded was not worthy of significant weight. He also contends that the questions posed the VE were inadequate, and therefore, could not support the ALJ's conclusion about Adams's ability to work. I will address these contentions in turn.

> 1.      Consideration of Dr. Shaukat's Physical Capacity Evaluation.

The opinions of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted). The ALJ must articulate the reasons for giving less weight to the opinion of the treating physician. *Id.*

Dr. Shaukat, Adams's treating physician, concluded that Adams would be able to sit, stand, or walk for less than one hour in an eight-hour workday, should keep both feet elevated at all times because of edema, could never bend, stoop, squat, kneel, or climb, and could not use his feet for repetitive movements such as pushing or pulling leg controls. In addition, Dr. Shaukat opined that

Adams could not lift up to five pounds during an eight-hour workday, nor perform any pushing and pulling arm controls, simple grasping, or fine manipulation.  Adams would be totally restricted from exposure to extreme cold or heat, high humidity, chemicals such as solvents or cleaners, fumes, odors, dust, moving machinery, and heights.

The ALJ found that Dr. Shaukat's RFC was contradicted by his own clinical notes, which showed that Adams's condition improved when he was compliant with medication.  As discussed above, this conclusion is supported by evidence in the record that even Adams's acute attacks requiring hospitalization resolved with administration of medication and use of the breathing machines.  The ALJ also correctly observed that Dr. Shaukat's opinion did not address how Adams's condition might have improved if he had been compliant not only with medication, but also with diet and cessation of smoking.

The ALJ also correctly noted that Dr. Haté's assessment after examining Adams was consistent with the opinion of Dr. Tan, the reviewing physician, regarding Adams's exertional ability.  As for nonexertional limitations, however, the ALJ apparently credited Dr. Shaukat's assessment that Adams would have postural impairments, albeit not to the same extent as indicated by Dr. Shaukat.  Indeed, the record supports a finding that Dr. Shaukat's assessment was overstated.  For instance, Dr. Shaukat opined that Adams would have to elevate his legs at all times due to edema.  However, the record reflects both improvement and later absence of edema.

Accordingly, the ALJ articulated specific and adequate reasons that are supported by substantial evidence for failing to accept Dr. Shaukat's RFC assessment.

2.     Consideration of Adams's Sleep Apnea.

Plaintiff contends that the ALJ failed to include in the hypothetical questions posed to the VE "the full extent of the limitations regarding [Adams's] severe breathing problems and sleep apnea problems."  Doc. No. 20 at 13.

Case law in this circuit requires that the ALJ employ hypothetical questions that are accurate and supportable on the record and include all limitations or restrictions of the particular claimant.  *Pendley v. Heckler*, 767 F.2d 1561, 1562-63 (11th Cir. 1985). When the hypothetical upon which the vocational expert bases her testimony does not fully assume all of a claimant's limitations, the decision of the ALJ based significantly on the expert testimony is unsupported by substantial evidence. *Id*. at 1563 (citing *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)). However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

As discussed above, the ALJ found that Adams's testimony about the functional limitations he suffered was not entirely credible, which decision was supported by substantial evidence. Accordingly, the ALJ was not required to include in the hypothetical question Adams's testimony about the functional limitations arising from his breathing and sleep apnea problems.  Even if Adams's testimony about inability to drive were credited, which might foreclose the job of cart driver, the VE identified other jobs that Adams could perform that did not require him to drive. Accordingly, this assignment of error is also unavailing.

**VI.     CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 8, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties